Noah Leibovitz, on behalf of Appellant and Patent Donor, True Spec Golf. Your Honors, as our briefing reflects, the final written decisions that we have in this case should be reversed for numerous reasons. I'd like to start, if I can, with the Board's erroneous consideration of Club Champion's new testing theory in their reply. Per the statute, Club Champion should have, in its petition, identified the theories and grounds and evidence that supported its unpatentability case. And for an unpatentability case based on obviousness, which is what Club Champion put forward here, that includes motivation to combine and reasonable expectation of success. But the problem is, Your Honor, the Board erred by allowing Club Champion to introduce a new theory on motivation to combine and reasonable expectation of success. Was that a new theory that was introduced, or was it just information, maybe even evidence to revoke? Well, no, Your Honor, I think it was a new theory. And the new theory was that, in their petition, they relied on BERT. So you would agree that you can't present information in rebuttal? Yes, Your Honor, and I think some of the cases that this Court has decided after the briefing was closed, in this case, are instructive here. So, for example, the Core Photonics v. Apple case, which Club Champion actually raised to the Court for Supplemental Authority, that decision has an analysis of both what it calls a responsiveness restriction, but also a newness restriction. And as the Court in Photonics made clear, one question is responsiveness. And so any argument presented in reply needs to be responsive to what the patent donor put in the patent donor response. But even if it's responsive, you can't rely on new theories in reply. And this is the words of Core Photonics. Can I just get to this case? Yes, sir. Didn't the petition say something about reasonable expectation of success in making this combination? It did, Your Honor, but the argument on reasonable expectation of success and motivation to combine was based entirely on BERT, a different reference of a different type of connector. There was no discussion in the petition on testing. So this is the way that I guess I'm understanding this, and just correct me where I'm wrong. So I took it that the petition said, we've got these references, there's a motivation to combine, and there's a reasonable expectation of success. BERT kind of provides both of those, but we're asserting a reasonable expectation of success. You come back and you say in patent donor response, there wouldn't have been a reasonable expectation of success. In fact, there would be serious performance deficiencies that we think would exist, and only testing would tell you. They come back and say, we're going to reply to the performance deficiencies point, which is the point you make against reasonable expectation of success, and their testing is responsive to that assertion. That then eliminates, if you credit it, your performance deficiency point, but it leaves in place the reasonable expectation of success point that was in the petition. And that's kind of one thing. And just finally, the board says, doesn't it, that it's going to rely, allow the testing only as rebuttal, not for the affirmative reasonable expectation of success. Why is there some procedural or other problem with that? Okay, let me address both of those, Your Honor. So first, the way Your Honor has recounted it, I'd say it's slightly different, which is that their theory on reasonable expectation of success and motivation to combine was based on not one of the references they put forward as one of their cited prior references, but based on Birch. And in response, we said, Birch is a very different type of connector. The differences between Birch and their primary reference, Burroughs 269, would not lead one to take the problem that Birch identifies as this mismatch between shaft and hosel size, and apply that to their primary reference, Burroughs 269. There was no indication in the petition, no reliance on testing or anything like that. We did say, and we didn't say there would necessarily be performance issues, what we said is that a person of ordinary skill in the art assessing this would believe that there may be performance issues, and so wouldn't apply a very different connector of Birch to the Burroughs 269 type connector. Especially modified in the way they did, where you essentially remove the particular thing that Burroughs 269 says gives it structural rigidity and integrity. Their modification would remove that. And so we said based on that, based on the language of Burroughs 269, you wouldn't take from Birch the solution to this problem and apply it to Burroughs 269. Then in reply, there... Do you think that the board, am I remembering correctly, that on the question of admitting the evidence, the motion to strike or whatever it was, the board said we're going to consider it but for a limited purpose. Do you think that the board adhered to that limitation in its discussion of the evidence? Right, so two points there, Your Honor. So first, we think what the board said there was that it would actually, I think the board's words were eviscerate. It would eviscerate the statutory restrictions if Club Champion were allowed to rely on this new testing evidence in their affirmative case. And so they're going to consider it just for reply. The problem is they didn't adhere to that, or if they did, it was really a name only. Because if Your Honors look at the board's final decision, this is important in terms of this case, if you look at the way they decided the case, this is appendix page 45, on the affirmative case, right, all the board's analysis was on the affirmative case on appendix 45 is they recite petitioner's arguments, they recite Club Champion's arguments, and then at the end of that summary, there's a single sentence, one sentence, and all it says is we find petitioner's motivation to combine evidence to be persuasive. There's no analysis or reasoned explanation as to the board's analysis there. There's nothing this court can possibly review to say that the board came to a correct or incorrect decision about their affirmative case on motivation to combine an expectation of success. Why can't we just read that sentence as adopting all of the reasoning and argument and evidence that was presented by the petitioner that it recounted? Well, they don't explain that, Your Honor, and they don't address any of the issues with that from the textual part of Burroughs 269, their primary reference, which talks about keeping the shaft going through the hosel all the way to the bottom. They don't address any of the issues with respect to petitioner's analysis on motivation or reasonable expectation of success, and then they just switch to rebuttal mode and then address everything else in terms of rebuttal to our arguments, which then they focus on the testing evidence to, quote-unquote, rebut. But if all the board has to do in the affirmative case, this distinction that they contrive between allowing Club Champion to rely on the testing evidence for rebuttal but not for the affirmative case, how does that mean anything? If in analyzing the affirmative case, all the board has to say is we find it persuasive and then move to rebuttal, and that's what happened here. And that, we believe, sort of evinces the shift and the incorrect shift in putting the burden on TruSpec to rebut the claim of obviousness rather than on Club Champion to come forward with an affirmative case on motivation and reasonable expectation of success. And the reason why is it really is a shift in theory, right? It's a different theory, in our view, to rely on Birch, which is a reference that has a completely different type of connector as showing motivation to combine and reasonable expectation of success than it is to rely on testing a physical embodiment of their primary reference, Burroughs 269, and basing motivation to combine and reasonable expectation of success on that. If you're basing it on Birch, which is what their petition did, then, you know, that's what we meant in our brief when we said somebody presented with Birch would use Birch because you have a connector. If that was the issue, right, and as this court's TQ Delta and other cases make clear, it's not enough for motivation to combine and expectation of success to just identify the problem. We don't dispute that Birch talks about this issue, this mismatch of shaft and hosel size, but the solution that Birch proposes with respect to its connector, the question is would a person of ordinary skill be motivated to apply that to a very different connector in Burroughs where Burroughs itself, I mean the language in Burroughs, you know, we talked about it in terms of teaching away, we think it really couldn't be clearer that Burroughs discusses, and I cite your honors to Burroughs column three, lines 41 to 51, and seven lines 47 to 56. Burroughs talks about its secure and stable two-point connection, and it talks about those two points, and I'm quoting from Burroughs, two points spaced axially by the substantial length of the adapter insert and socket. So you have the shaft going into the connector, into the hosel, all the way from the top to the bottom, and Burroughs says that is what enhances the structural rigidity and integrity of the interconnected components. So we understand that Birch points out the issue with that, but that a person of ordinary skill would be motivated to just chop off the shaft of Burroughs and leave a void in the connector where Burroughs points to that exact thing as what enhances the structural rigidity and integrity of its connector. A person of ordinary skill would not take that from Birch, which is what their initial argument on motivation to combine expectation of success was, as opposed to, on reply, this new argument that if you test a physical embodiment of Burroughs 269, that a person of ordinary skill would know. And by the way, that testing was done for the first time in this case. There was no indication that testing had ever, anyone at the time, had ever done that kind of testing with respect to Burroughs 269, and was done using modern test equipment, and so there's no indication that even at the time, a person of ordinary skill could have come to the conclusions that petitioner put forward with respect to motivation and reasonable expectation of success to reach the invention at the time. I know I'm going to be getting very close to my rebuttal time, Your Honor, but I did want to talk just for a minute about the objective indicia and the nexus issue, because we think the board did err in a number of different ways with respect to nexus. First, the board refused to presume, to have a presumption of nexus, even though TruSpec sells the FASFET connector, which is unquestionably a direct embodiment of the 899 patent. All of the components are there. It's sold with a sheet, and a spec sheet that identifies the method. It is a direct and coextensive with the 899 claim, but the board refused to find a presumption of nexus, and we think that was error. Plus, the board divided the claims into what it called the old parts of the claim and the new parts of the claim, and found that the commercial success and the long-felt need needed to be based specifically on the novel aspects of the invention rather than the claim as a whole. And that's contrary to this court's decision in the WBIP v. Kohler case that specifically held proof of nexus is not limited only to when objective indicia is tied to the supposedly, quote, new features. Did you make a WBIP argument below to the board? I didn't see it in the briefing. Well, I'm not sure we knew that the board was going to divide the claims that way, Your Honor. We certainly didn't think that that was supposed to happen. I thought the board just simply addressed the arguments that you raised, which was the convenience of the interchangeability of the club heads and the club shaft. Well, sure, but Your Honor, all the arguments we made were based on the claims, with the particular connector that we use and that we sell with respect to the FASTA connector. So that connector has all of the limitations of the claim, including what the board found was old in terms of the compression nut, in terms of the shaft adapter, the head adapter. All of that is part of the physical commercial embodiment of what's being sold. The board just didn't give the totality of that any weight and said, OK, well, the only new thing here is you're keeping the shaft outside of the hosel. But in reality, that only makes sense with the rest of the connector being sold. We're not saying we're the only connector that keeps the shaft outside the hosel. Birch does, but it's a very different type of connector. You can't divorce the physical embodiment from the result of that physical embodiment. Thank you, Your Honor. Thank you. Good morning, and may it please the Court. Bill Burgess on behalf of Club Champion. I'd like to respond to what the Court's been asking my opponent about this morning, the testing evidence and the secondary considerations. Before I dive into one or the other, I think important context for both of them is just how narrow this dispute was. If you look at our brief at page 18, footnote 2, you see where in the record TSG does not dispute that Burroughs discloses all elements of Claims 1, 2, 15, and 16. This is important because this case is only about the dependent claims 3, 5, and 19. And so if you take Burroughs and the shaft doesn't enter the hosel, you have Claims 3, 5, and 19. So the question for the PTAB was the narrow question whether a skilled artisan looking at Burroughs would be motivated to keep the shaft outside the hosel and reasonably expect success. It wasn't just Birch, but Birch answers that question remarkably clearly. You know what the cases say about motivation to combine. It can come from a design need, nature of the problem to be solved, that sort of thing. Birch answers it explicitly at Appendix 1437, paragraph 20. It tees up the diameter mismatch problem and the outside the hosel solution. And importantly, at Appendix 1437 to 38, paragraph 28, Birch says, you trim the shaft to compensate for the connector making the whole club longer. This was a tradeoff. It's not just known in the art generally. It is explicit in the art. So TSG didn't dispute our mapping of the prior art to Burroughs, can't dispute what Birch actually says. It makes two narrow categories of arguments. One is secondary considerations, and one is what they say are affirmative reasons not to combine. And that's all our reply was responding to.  Their argument was that if you trim the shaft of Burroughs, it is a true fact of science that shortening the shaft would affect whip and launch angle because it alters the weight distribution of the club. And you can see this in their patented response at Appendix 423. They don't say a person would believe this or expect it or predict, but there's no way to know. They say keeping the shaft outside the hosel would leave a gap in the hosel board that would alter the overall weight and distribution of the assembled club. And they go on. I'm not going to read the whole paragraph. Another way you know this is Appendix 2128. In response to a question about testing, Burroughs says, he knew that any changes to weight would affect the way the ball flies. We knew that if we added a plug, it would have added weight. It would have changed the characteristic of the ball flight. We knew anything you add in that stack to add weight changes everything. This is him responding to our questions about why he didn't do the testing himself. In our reply, we had three responses to that. First was that weight versus solving the diameter mismatch is a known tradeoff, especially in light of prior art outside the hosel connectors. You can see that primarily at Appendix 524 to 525 of our reply. You can also see this in Mr. Burroughs' testimony at 2117 where he admits, in our view, the best reading of that testimony, that this is a tradeoff. He says there are prior art connectors that do outside the hosel connections, but the weight distribution and things that were important to Mr. Burroughs were not important to these prior art people. It was a tradeoff. We also say TSG is wrong technically, wrong about the science, wrong about the two-point connection, and wrong that changing the weight distribution of Burroughs would unacceptably affect the club. You can see this at Appendix 525 to 527. You can see this at Appendix 1522, which is our Vincent's second expert declaration where he has an illustration and explains why they're wrong on the science. Then where the testing comes in is to confirm our response to their assertion about a true fact of science. We say testing confirms that they are wrong. You can see that at Appendix 1524, Paragraph 32, which introduces the testing. Basically, our expert is saying the testing confirms everything I've just said up until now without mentioning testing. Then at Appendix 1551, Paragraph 81, is where the testing evidence starts. Again, he prefaces that with a note that this is about confirming. It wasn't a new theory. My opponent said something about teaching away. Appendix 49, the board addresses that and says we see nothing in Burroughs that rises to the level of teaching away. My opponent said something about the structure of the board's opinion. I have a question. I have a concern about testing. It seems to me that it's a slippery slope because it's an inference of hindsight. Would you agree to that? I'm not sure I understand the question. I think the board was careful to avoid misuse of the testing. Its order, admitting the testing for a limited purpose, acknowledges that there is a danger in the board's view that this could be used for an improper purpose. It agrees with TruSpecGolf to a limited extent. To the extent that testing connects to our expert's initial declaration, the thing it connects to the most is this one paragraph. If you're using the testing to supplement this one point in this one paragraph, that would be problematic. But then the board goes on on the next page and says, to avoid that problem we're going to accept it for this limited purpose, a limited purpose of rebutting their affirmative assertion that if you change anything at all about Burroughs that affects the weight, then a person born near Scotty Island would do that. If I could just piggyback on Judge Rainer's question. I guess the question is would present-day testing, does that really tell us anything about what a skilled artisan at the time of the invention, I don't know, going back ten years or so, what that person would have thought at that time? And is it possible that, therefore, trying to use present-day testing is doing some kind of hindsight bootstrapping, and thereby not really answering the relevant question, which is what would skilled artisans ten years ago have actually thought about WIP? I agree with the concern in the question, and my point is we weren't offering it for that, and the board wasn't using it for that. Their assertion wasn't, hey, ten years ago, no one would have believed this or no one would have predicted it. Their assertion, mainly at Appendix 423 of their patent owner response, is what would happen? This is a true fact of science. If you shorten the shaft, it will throw off the weight distribution of the golf club. And this is them trying, because they can't deny the mapping of Burroughs to the other elements, and they can't deny what Burch says, they're trying to read Burroughs narrowly. They're saying you wouldn't change anything about Burroughs because all these I guess the idea is Burroughs said this wouldn't work, and then you came back with testing evidence, and basically impeaching Burroughs' assertion saying, no, it actually does work. See? Is that what you're essentially saying? I think I put it slightly differently. Burch isn't saying, Burroughs is saying, not just that you wouldn't do it because of what we happened to know 10 years ago, but just he's saying you couldn't. This is a golf club, weight distribution is important, and Burroughs says, you know, my invention relates to top-of-the-line stuff, and it's only two Burroughs, which he says at the bottom of 2117, the PGA pros uses invention and all that. So what he's saying is that because of the nature of his invention, anything that throws off the weight distribution is just unacceptable. I think... And you're talking here about Burroughs the witness. Yeah, Burroughs, I'm sorry. Yes, Burroughs the witness. Burroughs the witness. Burroughs the declarant. This is all that was responding to. He was saying this is a true fact about science, not a prediction, not something that may or may not have been known 10 years ago. It's just, if you take, again, as I said at the outset, like the one difference between these claims and Burroughs is just shorten the shaft. And they're saying you wouldn't shorten the shaft because that's an unacceptable change in weight. We looked into it. We said they're wrong on the science. Now, what's the problem when the shaft becomes instable or it affects performance? I think what Burroughs said in his declaration, their point is that the overall balance, he said a bunch of things, which we rebutted. But to this point, what he said was it affects the weight distribution. Anything you change in the stack, I think he says at the bottom. And that affects performance. According to Mr. Burroughs, yes. If you start with a Burroughs connector where the shaft is all the way in the hosel, and you retract it so the shaft comes outside the hosel. So the testing results should be directed only to the performance issue. Right. That's what the board accepted our testing for, is limited direct response to a specific thing. Mr. Burroughs said in his declaration. And I think the question he brought out, the board's analysis up to that point, up to Appendix 45, underscores how narrow the dispute is and finds our arguments, our affirmative case about motivation to combine and reasonable expectation of success to be persuasive. This wasn't a new theory. The board correctly found it wasn't a new theory. It was a direct response to something they said in their patent owner response. We looked into it. We explained why it was wrong. We explained why this was a known tradeoff in the prior art. And then we did testing to confirm that they were wrong on the science. If anything, we might have been a little bit too thorough on that point. But this was a side issue that they raised that had no central relevance to anything. And we looked into it and we rebutted it. And the board didn't act outside of its discretion. Can you turn to the secondary considerations? And I think principally we heard an argument about error this morning, that is, that error in not applying the presumption of nexus. Yes, certainly. If I've omitted something that you want to respond to on the secondary considerations, please do. That's what I'm remembering. No, I think that was the point about nexus. I would start by saying that you don't even need to reach presumption of nexus because the board gave alternative findings. The board has nine pages of analysis from Appendix 29 to 37, and it's in two sections. In Appendix 34, the first full paragraph, the board said, not only did I find no nexus, but I looked at their evidence and found that it was unpersuasive. So this is just like the VE Aerospace case we cite in our brief, which is 709 Federal Appendix 695, where the board didn't address nexus at all. I'm sorry. They're evidence on nexus. The board doesn't have to find it persuasive if there's a presumption, does it? I'm sorry. I think I might have jumbled a word in there. The board found no nexus in the first part of its analysis, and then it looked at its secondary considerations, their supposed commercial success and long-felt need and that sort of thing, and said on its own this evidence is unpersuasive. The unpersuasiveness of that evidence, even if you presume nexus, is an independent basis to affirm. That's what I was trying to say, and I think I might have garbled my words. I mean, this is like the VE Aerospace case. This court said the court didn't address nexus at all, but the court affirmed, for purposes of our analysis on appeal, we assume that a nexus exists, and then this court affirmed because substantial evidence supported the board's weighing. Another example of the same thing is the shoes-by-firebug case versus Striderate, 962 F. 1362 or 1372. Putting that aside, which maybe is sufficient for the disposition on secondary consideration, can you address the asserted error in not finding nexus? Sure. I mean, I think my opposing counsel's argument is focused on the presumption of nexus, and as I think one of your questions. Not finding an applicable presumption. That's right. I think as your questions brought out, this was the board answering the way they argued this case. I mean, the board quotes their patent owner response for where they say the nexus lies, and they made two arguments. They said there is a nexus. The success of this FASFET connector is due to the outside the hosel connection, and they said it's because you don't have to make any alterations to the heads and the shafts. And everything the board says in that part is entirely appropriate with respect to presumption of nexus. The no need for modification point, it's not in the claims. I mean, that's a proper rebuttal on the question of coextensiveness, which is relevant to the presumption of nexus. And the rest of it is just the board looking at it, looking at the simple point that nexus is about, you know, whether the supposed commercial success or industry praise or that sort of thing is tied to what's new and in the claims. And there was a reference to WBIP. I agree with Judge Chen's question. They didn't make a WBIP argument below, but WBIP says a few different things about commercial success. It says it may be linked to an individual element, or in other circumstances, it could be linked to the inventive combination of known elements. These are fact questions. This is 829F 1332. It says these are highly fact-dependent questions, not resolvable by appellate-created categorical rules. In this case, what was going on with the presumption of nexus was simply the board looking at their arguments and explaining why they're unpersuasive. The outside the hosel limitation, again, this is a really narrow dispute because they don't dispute our mapping of boroughs to the broader claims. This was only about the outside the hosel limitations, and this was their argument for why there was a nexus, and the board's comments on that I thought were entirely appropriate. I'm not sure if that fully answers your question or not. I guess I don't know if this is different from what we've just been discussing. We see often the argument for nexus based on the idea that the product embodies the patent, and that's clearly insufficient. The key question is whether it's coextensive, which is a question about whether there is more of the product than is identified in the claim. Was there a dispute about that? Was it FASFIT? Is that the name of their product? I believe FASFIT is the name of their product that we're talking about, yes. Did you have an argument that FASFIT has features in it that are not claimed here? I don't think that was our argument. I think we disputed the no need for modification point, and to me that's a coextensive argument, but other than that I don't recall that we argued that FASFIT, any commercial success was due to other factors. Our primary argument was that there is actually no commercial success, and their evidence of commercial success is really far removed from the invention data. That goes to the weighing. That's what the Board says in Appendix 34 and 37. It didn't come up in the opening, but we think the Board's criticisms are entirely appropriate, including the evidence it cites for those criticisms, and that's a sufficient basis to affirm here. To answer your question directly, I think our main argument on coextensiveness was about the FASFIT and the idea that you don't necessarily need to modify the head of the shaft. There was some discussion as to the Harvey reference being an antiquated reference. I think it was 80 years old. Does that really pose a problem here? I don't think it does, primarily because our primary reference was Burroughs, and that discloses most of the elements, so this isn't a case like Leo where the primary references were from 1978, 1986, and this was a 2000 patent. Our primary reference was Burroughs. It's from 2005, and the only difference between Burroughs and these claims is you take the shaft outside the hosel. We had two grounds. One was Burroughs alone, and the other was Burroughs in light of Hartley, and the main point of Hartley is just that it is directed to the same problem and discloses very similar structures. There was compiling on. We cite a 1997 Clubmakers Art Treatise, and the Board cites this too, which mentions Hartley by name in 1997 as relevant to modern-day club design. This is ultimately a fact question, and the Board's consideration of Hartley is supported by substantial evidence. Okay. I think we have your arguments. Okay. Thank you. Thank you. Mr. Lippowitz, we're going to destroy you in 30 minutes. Thank you, Your Honor. Your Honor, I'd like to start with the point the counsel is making with respect to the testing evidence rebutting Mr. Burroughs' testimony, and if Your Honors look in the appendix, this is Appendix 5834. It's Paragraph 32 of Mr. Burroughs' declaration. What Mr. Burroughs says is, this I'm quoting from Paragraph 32, for example, a posita would have expected that a club assembled using a temporary connector, like the 269 patent, but without the shaft fully inserted into the hosel bore, would perform very differently from, and would not actually reflect, the performance of a club assembled from the same club head and shaft, et cetera. Mr. Burroughs' declaration is framed entirely in terms of what a person of ordinary skill in the art would expect from having the Burroughs 269 reference in front of them. It wasn't some scientific argument with respect to this has to happen. Was Burroughs also deposed? Burroughs was also deposed. Okay. I recall the opposing counsel referring to deposition testimony. Correct, Your Honor. And at his deposition, he was asked different questions about, you know, about what would happen under certain scenarios. And in some cases, he said, well, we wouldn't know that. I wouldn't know that unless you tested things. So then for them to then say, okay, well, now we're going to go out and test the modification that was a modification that Mr. Burroughs never made, never tested, but the modification that they put forward, which is where you have Burroughs 269 that has the shaft going all the way through the hosel. We're just going to cut the shaft out and leave a void in the very spot that Burroughs refers to as needing structural rigidity and integrity. The argument that we put forward was that a person of ordinary skill would not expect, would not have made, would not have a motivation to do that and would not have a reasonable expectation of success in doing that. And this after-the-fact testing does admit to hindsight and does, we think, admit to sort of the way the board did it, shifting the burden. It's not a, you know, counsel set it up as there's this binary choice between shaft in the hosel, shaft outside the hosel. And the only thing that's different here is the shaft is outside the hosel. But the reality is there's many, and the record reflects this, there's many different design choices that go in different directions and competing directions with respect to designing one of these connectors. So simply saying we're going to keep the shaft outside the hosel, the question is, well, how does that affect the rest of the design? And where you have a design like Burroughs 269 with the shaft intentionally put into the hosel, just saying, well, the only difference is we're going to take the shaft outside the hosel, that doesn't reflect the way a club designer and a designer of these connectors would approach the problem, which is what Mr. Burroughs was discussing in his declaration and at his deposition. I would also just talk about the secondary addition just for another moment, because I think Your Honor's question with respect to the presumption of nexus really hit it on its head. There was no argument here on coextensiveness. The FASFET is coextensive. That was the argument that we put forward. There's evidence of that in the record in terms of what it looks like and how it functions. This isn't like the FASFET was a component of some larger product that's being sold. It is exactly the connector that's discussed in the 899 patent. And so then to say we're not going to presume nexus, but we're going to then look at the evidence, well, the presumption then affects the way the board, the lens through which the board views the rest of the evidence on commercial success. And in addition to the error on presumption, the board erred in this case in – Can a product be coextensive with a method claim? Yes, Your Honor. We believe it can. I mean, it's a method of assembling a golf club, right? Correct. It's a method of assembling a golf club and it lays out – The product is just the connector itself. It's not the golf club head. It's not the golf club shaft. It's just the connector. That's true, Your Honor. So I guess, you know, maybe theoretically, yes, a product can represent coextensiveness with a claimed method, but I would imagine there's other times where it wouldn't. Well, there may be times, Your Honor, where it's not, but certainly there's no rule that I know that a product can't be coextensive with a method. And especially in this situation, if you look at the product, as we put in below and here and review the method, that is exactly the components that are discussed in the 899 patent are all there, and they all function exactly the way the 899 patent lays out in the method. So it's not a coextensiveness issue. And the board's analysis on this point, and the board decided this case before this court's decision in the Camorra's case, which we cite in our briefing as well, discussing one of the things the board did here is basically say, we're not going to give very much weight to the commercial success arguments because there was no discussion of market share. First of all, that's factually incorrect. There was discussion of market share. But second of all, the market share, this court decided that you don't need market share evidence in order for commercial success to be an appropriate consideration. And Co-Champion, in its briefing, says, well, no, the board was just looking for context. It was just looking for context. But, Your Honor, if you read the board's decision here, what they said was we didn't put in evidence of market share, and therefore that's the end of the inquiry, essentially. And the market share point, we had, you know, it wasn't just 85,000 connectors. We had evidence that it takes about 150 connectors to open a store. And so 85,000 connectors is more than 500 individual club fitting stores. And there was evidence that 109 club fitters on the Golf Digest list of top club fitters used the FazFit. And there were articles about club connects and how important it is to the golf industry. So this was not devoid of context. It was error by the board in the way they considered the evidence. Do you want a conclusion? I was going to say thank you, Your Honor. Thank you. Thank the Congress. Thank you, Your Honor.